IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 07-cv-02319-CMA-BNB

ALLEN BERGERUD,

Plaintiff,

v.

JOSEPH FORTUNATO, D.O.,
KATHY RITTENHOUSE, N.P., and
BRIAN WEBSTER, P.A.,

Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

This matter is before me on **Defendants' Motion for Summary Judgment** [Doc. #44]

(the "Motion").  I respectfully RECOMMEND that the Motion be GRANTED.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings.  Haines v.

Kerner, 404 U.S. 519, 520-21 (1972).  I cannot act as advocate for a *pro se* litigant, however,

who must comply with the fundamental requirements of the Federal Rules of Civil Procedure.

Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most

favorable to the party opposing the motion and that party must be afforded the benefit of all

reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S.

144, 157 (1970).  Rule 56(c), Fed.R.Civ.P., provides that summary judgment should be rendered

"if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 447 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  <u>Trainor v. Apollo Metal Specialties, Inc.</u>, 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  <u>Celotex</u>, 447 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.  BACKGROUND

The plaintiff is incarcerated by the Colorado Department of Corrections ("DOC") at the Sterling Correctional Facility ("SCF").  The Complaint asserts two claims for relief.  Claim One alleges deliberate indifference in violation of the Eighth Amendment based on the medical treatment plaintiff received after he fell off his bunk and injured his pelvis.  <u>Id.</u> at pp. 7-8.  Claim Two alleges deliberate indifference in violation of the Eighth Amendment based on the medical

treatment he received for his diabetes.[1]  <u>Id.</u> at pp. 8-9.  The plaintiff seeks monetary damages, declaratory relief, and injunctive relief.  <u>Id.</u> at p. 10.

### III.  UNDISPUTED MATERIAL FACTS[2]

1.  The plaintiff is a Type I diabetic, which means that his body does not produce insulin and that he must receive insulin injections.  *Motion*, pp. 1-2, ¶ 1; Ex. A-1, ¶ 9; Ex. A-2, ¶ 18; *Plaintiff's Response to Defendants Motion for Summary Judgment* [Doc. #52] (the "Response"), p. 5, ¶ 1.  Insulin is a chemical that allows the body to utilize the glucose in the blood stream, resulting in lower blood sugar.  Type I diabetics need insulin to lower their blood sugar because their body cannot naturally drive the blood sugar into their cells.  *Motion*, Ex. A-1, ¶ 10.

2.  There are numerous types of insulin which are categorized according to how frequently they are taken, the length of time it takes for them to become effective, and how long they last.  *Motion*, p. 2, ¶ 2 and Ex. A-1, ¶ 11; *Response*, p. 5, ¶ 2.

3.  Fast acting insulin, such as Regular insulin and Humalog, begin to act within a short time span.  Regular insulin begins to act within about 30 minutes, peaks at about two to three hours, and lasts for approximately four to six hours.  Humalog begins to act within about 10 minutes, peaks at about 30 minutes and lasts for about 3 hours.  *Motion*, p. 2, ¶ 3 and Ex. A-1, ¶ 11; *Response*, p. 5, ¶ 3.

---

[1]To the extent the plaintiff attempts to bring other claims, they are unintelligible and will not be recognized.  <u>See</u> <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based").

[2]The plaintiff disputes many of the defendants' factual statements, and he makes numerous factual statements of his own.  However, he does not always provide evidence to support his version of the facts, and sometimes the evidence he cites does not support a factual statement.  I do not consider unsupported factual statements.

4. Long acting insulin lasts much longer, has a peak, and is normally taken two times per day. NPH is a long acting insulin that lasts 16 hours. Lantus is a long acting insulin that is taken one time per day and lasts 24 hours. *Motion*, p. 2, ¶ 4 and Ex. A-1, ¶ 12; *Response*, p. 2, ¶ 4.

5. The treatment for Type I diabetes varies from individual to individual. Treatment also commonly varies with the individual, and it is common to adjust the amount of insulin given to a Type I diabetic in order to help stabilize their blood sugar. *Motion*, p. 2, ¶ 5 and Ex. A-1, ¶¶ 13-14; *Response*, p. 5, ¶ 5.

6. Most patients receive a long acting insulin. When they eat, they also take short acting insulin to cover the surge in blood glucose that occurs with a meal. *Motion*, p. 2, ¶ 6 and Ex. A-1, ¶ 13; *Response*, p. 5, ¶ 6.

7. In addition to their insulin, it is critical for Type I diabetics to eat a well-balanced, regular and consistent diet, and to not skip meals to stabilize their blood sugar. Insulin alone will not stabilize a patient's blood sugar if the patient is skipping meals and eating excess sugar, fat, and carbohydrates. *Motion*, pp. 2-3, ¶ 7; Ex. A-1, ¶ 15; Ex. A-2, ¶ 24 *Response*, p. 2, ¶ 7.

8. The plaintiff was transferred to SCF on February 28, 2006, from the Denver Reception and Diagnostic Center ("DRDC"). *Motion*, p. 3, ¶ 8 and Ex. A-1, ¶ 18; *Response*, p. 5, ¶ 8.

9. The DRDC medication administration record documents that the plaintiff was receiving his scheduled dose of NPH and regular insulin twice daily. He also received sliding scale insulin shots. *Motion*, p. 4, ¶ 9 and Ex. A-1, ¶ 19; *Response*, p. 3, ¶ 9.

11.     On March 4, 2006, the plaintiff was taken to the Sterling Regional Medical Center emergency room after a reported fall from his top bunk.  *Motion*, p. 3, ¶ 12 and Ex. A-1, ¶ 21; *Response*, ¶ 12.

12.     The plaintiff had a laceration to his forehead, bruising around his right eye, and dried blood in both nostrils.  *Motion*, p. 3, ¶ 12 and Ex. A-1, ¶¶ 21-22; *Response*, p. 5, ¶ 12.  The emergency room physician documented that the plaintiff was capable of bearing weight but had some tenderness over the anterior aspect of his right pelvis.  The x-rays obtained in the emergency room were initially interpreted as being normal.  *Motion*, p. 3, ¶ 13 and Ex. A-1, ¶ 31; *Response*, p. 3, ¶ 13.

13.     Upon his return to SCF from the hospital, the plaintiff was initially placed in a holding or observation cell.  *Motion*, p. 6, ¶ 31 and Ex. A-1, ¶ 39; *Response*, p. 6, ¶ 31.

14.     It is typical for offenders who require a brief period of monitoring due to a medical condition to be held in an observation cell in segregation because these cells are continuously monitored.  The period of observation can allow medical staff to determine if the offender is safe or stable enough to return to the general population.  *Motion*, p. 6, ¶ 32 and Ex. A-1, ¶ 40; *Response*, p. 6, ¶ 32.

15.     Observation cells have a bunk on which the inmate can recline or sleep.  Although the plaintiff initially had a blue plastic chair in his observation cell, observation cells ordinarily do not have chairs due to security concerns.  *Motion*, p. 6, ¶ 33 and Ex. A-1, 40; *Response*, p. 3, ¶ 33.

16.     During the time he was in the observation cell, the plaintiff was checked by the nursing staff during every shift.  *Motion*, p. 6, ¶ 34 and Ex. A-1, ¶ 41; *Response*, p. 6, ¶ 34.  In

addition, he was provided with narcotic pain medication and non-steroidal anti-inflammatory pain medication. *Motion*, p. 6, ¶ 35 and Ex. A-1, ¶ 41; *Response*, p. 6, ¶ 35.

17.     On March 6, 2006, a radiologist interpreted the plaintiff's x-ray and noted a possible fracture of the inferior ramus of the pelvis. *Motion*, Ex. A-1, ¶ 33.

18.     At all relevant times, defendant Fortunato was a physician at SCF. *Motion*, p. 3, ¶ 10 and Ex. A-2, ¶¶ 1-3; *Response*, p. 5, ¶ 10.

19.     Dr. Fortunato initially saw the plaintiff on March 9, 2006, to evaluate his injuries from the fall. *Motion*, p. 3, ¶ 11 and Ex. A-2, ¶ 7; *Response*, p. 5, ¶ 11. After assessing the plaintiff's wounds, Dr. Fortunato requested a repeat x-ray of the pelvis to confirm the questionable ramus fracture. After reviewing the findings, Dr. Fortunato discussed the plaintiff's plan of care with an orthopedic specialist, Dr. Pohlman. *Motion*, p. 4, ¶¶ 14, 24 and Ex. A-2, ¶¶ 9, 11; *Response*, p. 6, ¶¶ 14, 24. Dr. Fortunato documented the following:

> Inmate x-ray was read by myself and confirmed by Dr. Pulman as being fract of left pubic ramus, fract of post body of Ischemium and fract of ileopubic ramus. And quest fract of superior pubic ramus. We have agreed tx plan to consist of limited to no wt beqring left with use of crutches, wheel chair as current to ambulate to canteen and pain med to consist of vicodan and Motrin for addirtional 4 week's. Consult with Dr. Pulman for co management. Montiewr bladder which is ok currently. all this was explained to iinmate. It was discussed with Dr, Frantz that need's would not be met in the infirmary as he would be bed bound.

*Motion*, Ex. A-2, Attachment 2 (quoted as written with no correction or acknowledgment of errors).

20.  In addition to the crutches, the wheelchair, and the pain medications, the plaintiff was prescribed TED stockings, which aid in circulation and are used to prevent blood vessel blockages.  *Motion*, p. 4, ¶ 25 and Ex. A-2, ¶ 12; *Response*, p. 6, ¶ 25.

21.  A non-displaced pelvic fracture is not life or limb threatening and is managed conservatively.  It is treated by symptom management, and surgery would be inappropriate.  This type of fracture would not be expected to lead to long term pain or disability.  A patient with this type of fracture may be given crutches or a wheelchair to use as needed for comfort.  *Motion*, pp. 5-6, ¶ 28 and Ex. A-1, ¶¶ 34, 44; *Response*, p. 3, ¶ 28.

22.  When he was seen by Dr. Fortunato on March 9, 2006, the plaintiff had an active prescription for Motrin and had also been prescribed Vicodin, a narcotic pain medication.  *Motion*, p. 7, ¶ 36 and Exhibit A-2, ¶ 14; *Response*, p. 6, ¶ 36.

23.  On March 22, 2006, Dr. Fortunato renewed the plaintiff's Motrin for an additional six weeks and his Vicodin for an additional three weeks.  *Motion*, p. 7, ¶ 37 and Exhibit A-2, ¶ 14; *Response*, p. 6, ¶ 37.

24.  The plaintiff was resistant to Dr. Fortunato's treatment plan and insisted on using only a wheelchair.  *Motion*, p. 7, ¶ 38 and Exhibit A-2, ¶ 15; *Response*, p. 6, ¶ 38.

25.  By April 18, 2006, the plaintiff was able to get out of his wheelchair and walk without assistance.  *Motion*, p. 7, ¶ 39 and Ex. A-2, ¶ 16; *Response*, p. 4, ¶ 39.

26.  On May 4, 2006, Dr. Fortunato saw the plaintiff for his diabetes.  At that time, the plaintiff was on Humulin R, a short acting insulin, 20 units per day in divided doses, and Humulin N, an intermediate acting insulin, 24 units per day.  *Motion*, p. 7, ¶¶ 40-41 and Ex. A-2, ¶¶ 17, 19; *Response*, p 4, ¶ 40 and p. 6, ¶ 41.

27.   Dr. Fortunato discontinued these two insulins because his review of the plaintiff's blood sugars showed them to be erratic and uncontrolled.  He replaced them with Lantus, once daily at 5:00 p.m.  Lantus is a stable base insulin which, for the most part, is not plagued with high or low sugars.  *Motion*, p. 7, ¶¶ 42-43; Ex. A-1, ¶¶ 12, 47-48; Ex. A-2, ¶ 20; *Response*, p. 4, ¶ 43 and p. 6, ¶ 42.  Lantus takes approximately two hours to begin a steady state, and it lasts approximately all day.  *Motion*, p. 8, ¶ 44 and Ex. A-2, ¶ 22; *Response*, p. 4, ¶ 44.

28.   The plaintiff was educated on diabetes and placed on a 2400 calorie diabetic diet. The diabetic diet is a special diet that consists of nutritionally balanced meals and snacks that the inmate eats at regular times throughout the day.  *Motion*, p. 8, ¶ 45 and Ex. A-2, ¶ 23; *Response*, p. 7, ¶ 45.

29.   Dr. Fortunato ordered labs for the plaintiff, including Hemoglobin A1c ("Hgb A1c"), lipid profile and microalbumin.  *Motion*, p. 8, ¶ 46 and Ex. A-2, ¶ 25; *Response*, p. 7, ¶ 46.  An Hgb A1c test shows the average blood sugars for the previous 90 days.  The ideal and normal range Hgb A1c is approximately "7" or below.  *Motion*, p. 8, ¶ 47 and Ex. A-2, ¶ 25; *Response*, p. 7, ¶ 47.  Dr. Fortunato also ordered a fasting blood sugar in one week to give an accurate evaluation of the Lantus effects.  The plaintiff was to receive finger sticks per DOC protocol, which was three days per week in the morning and at noon, or as needed if a problem arose.  *Motion*, p. 8, ¶ 48 and Ex. A-2, ¶ 26; *Response*, p. 7, ¶ 48.

30.   Dr. Fortunato saw the plaintiff on June 1, 2006, for an ADA physical.  At that time, the plaintiff's crutches were discontinued because he was ambulating well.  *Motion*, p. 8, ¶ 49 and Ex. A-2, ¶ 27; *Response*, p. 7, ¶ 49.

31. The plaintiff's blood sugars were uncontrolled on the current dose of Lantus. Because his fasting blood sugar on May 30, 2006, was elevated, Dr. Fortunato increased the Lantus to 25 units per day. He also added 5 units of regular insulin each morning because the plaintiff's noon sugars were off, continued finger sticks, and ordered another fasting blood sugar in 10 days. The plaintiff was again educated on diabetic care. *Motion*, p. 8, ¶ 50 and Ex. A-2, ¶ 28; *Response*, p. 7, ¶ 50.

32. Dr. Fortunato reviewed the plaintiff's chart on July 13, 2006, at the request of the nursing staff. That morning, the plaintiff had requested 10 units of regular insulin when he had a normal sugar of 72. *Motion*, p. 9, ¶ 52 and Ex. A-2, ¶ 31; *Response*, p. 7, ¶ 52. Dr. Fortunato increased the plaintiff's Lantus from 25 to 32 units and increased his regular insulin in the morning from 5 to 10 units due to unsatisfactory blood sugar control. *Motion*, p. 9, ¶ 51 and Ex. A-2, ¶ 29; *Response*, p. 7, ¶ 51.

33. Dr. Fortunato saw the plaintiff on July 14, 2006. The plaintiff was again attempting to receive 10 units of regular insulin in the medicine line while having a normal morning sugar of 80. *Motion*, p. 9, ¶ 53 and Ex. A-2, ¶ 33; *Response*, p. 7, ¶ 53. Dr. Fortunato reviewed the plaintiff's canteen purchases, which showed purchases of excessive fat, sugar, and carbohydrates. *Motion*, p. 9, ¶ 54 and Ex. A-2, ¶ 34; *Response*, p. 7, ¶ 54. The plaintiff had also missed 26 of his diabetic meals. *Motion*, p. 9, ¶ 55 and Ex. A-2, ¶ 35; *Response*, p. 7, ¶ 55.

34. On this visit, the plaintiff's regular insulin was reduced from 10 units to 5 units and Lantus was increased from 32 to 36 to safely cover the plaintiff's blood sugars as revealed by his finger stick evaluations. *Motion*, p. 9, ¶ 56 and Ex. A-2, ¶ 36; *Response*, p. 7, ¶ 56. Based on his treatment and assessment of the plaintiff's behavior in relation to his diabetic care, Dr. Fortunato

believed that the plaintiff was attempting to manipulate and control his care though the manipulation of his diet. *Motion*, p. 9, ¶ 57 and Ex. A-2, ¶ 37; *Response*, p. 7, ¶ 57.

35.   On December 14, 2006, Dr. Fortunato attended a staff meeting with Nurse Lovell and defendants Rittenhouse and Webster. The plaintiff was advised of the importance of diet and to stop skipping meals. He was further advised that his noncompliance with his plan of care could result in disciplinary charges and/or being liable for emergency room visits. *Motion*, p. 10, ¶ 59 and Ex. A-2, ¶ 39; *Response*, p. 7, ¶ 59.

36.   The plaintiff agreed to stop skipping meals and to follow the plan of care, which included finger stick blood sugars twice per day and weekly appointments to review his blood sugars and adjust insulin as needed. *Motion*, p. 10, ¶ 60 and Ex. A-2, ¶ 40; *Response*, p. 7, ¶ 60.

37.   During his treatment of the plaintiff for diabetes, Dr. Fortunato does not recall the plaintiff losing weight, having difficulty walking, talking, having vision issues, wetting the bed, or any other failure to thrive issues. *Motion*, p. 10, ¶ 61 and Ex. A-2, ¶ 41; *Response*, pp. 4, 7. The plaintiff's medical records indicate that he had some weight fluctuations. An uncontrolled diabetic who is eating poorly and skipping meals will normally suffer from weight loss. *Motion*, p. 10, ¶ 62; Ex. A-1, ¶ 56; Ex. A-2, ¶ 42; *Response*, p. 4, ¶ 62.

38.   At all relevant times, defendant Rittenhouse was employed as a Nurse Practitioner at SCF. *Motion*, p. 10, ¶ 63; Ex. A-3; *Response*, p. 7, ¶ 63. Rittenhouse treated the plaintiff for his Type I diabetes beginning in 2006. This treatment included adjusting his insulins and prescribing other medications as needed; counseling him regarding how to better control his blood sugar; and ordering and interpreting his lab work. *Motion*, p. 10, ¶ 64; Ex. A-3, ¶ 4; *Response*, p. 7, ¶ 64.

39.     The medication administration records that were entered at the DRDC at the time of the plaintiff's transfer to SCF show that there were active orders for sliding scale regular insulin, as well as scheduled doses of NPH (12 units two times per day) and regular insulin (4 units two times per day).  *Motion*, p. 11, ¶ 68 and Ex. A-1, ¶ 19; *Response*, p. 7, ¶ 68.

40.     On March 1, 2006, Rittenhouse renewed the plaintiff's regular insulin (4 units two times per day).  The plaintiff still had active prescriptions for regular sliding scale and NPH insulin.  These prescriptions did not expire until May 4, 2006, and May 15, 2006.  *Motion*, p. 11, ¶ 69 and Ex. A-1, ¶ 20; *Response*, p. 7, ¶ 69.

41.     Rittenhouse saw the plaintiff on March 6, 2006.  At that time, the plaintiff's x-rays had not yet been interpreted and it was unknown by Rittenhouse whether he had a pelvic fracture.  *Motion*, p. 11, ¶ 70 and Ex. A-3, ¶¶ 9, 10; *Response*, p. 7, ¶ 70.

42.     Rittenhouse added medical housing restrictions to include a lower tier, lower bunk, no stairs, and no heavy lifting.  She also continued his wheelchair and crutches prescription, and prescribed him Ibuprofren (Motrin) in addition to the narcotic pain medication (Vicodin) he was already receiving.  *Motion*, pp. 1112, ¶ 71 and Ex. A-3, ¶¶ 9, 10; *Response*, p. 7, ¶ 71.

43.     Other than this visit, Rittenhouse did not participate in diagnosing Bergerud's pelvic injury or establishing a plan of care or treating Bergerud for his pelvic injury.  *Motion*, p. 12, ¶ 72 and Ex. A-3, ¶ 11; *Response*, p. 7, ¶ 72.

44.     Rittenhouse saw the plaintiff five times from July 11, 2006, to December 7, 2006.  Each visit consisted of discussing his blood sugars, adjusting his insulins, prescribing diabetic snacks, and ordering lab tests.  *Motion*, p. 12, ¶ 74 and Ex. A-3, ¶¶ 12-17; *Response*, p. 7, ¶ 74.

45. When Rittenhouse saw the plaintiff on December 7, 2006, he informed her that he was skipping lunch. Rittenhouse advised the plaintiff against skipping lunch and counseled him on the importance of eating all of his meals. *Motion*, p. 12, ¶ 75 and Ex. A-3, ¶ 17; *Response*, p. 7, ¶ 75.

46. Rittenhouse determined that a staff meeting should be scheduled to discuss the plaintiff's treatment plan for his diabetes. Rittenhouse scheduled a staff meeting due to her belief that the plaintiff was sabotaging his treatment by skipping meals and snacks in order to control his own insulin regime. *Motion*, p. 12, ¶ 76 and Ex. A-3, ¶ 19; *Response*, p. 7, ¶ 76.

47. Rittenhouse attended the staffing on December 14, 2006, during which the plaintiff agreed to stop skipping meals and agreed with the plan of care. *Motion*, pp. 12-13, ¶ 77 and Ex. A-3, ¶¶ 20, 21; *Response*, p. 7, ¶ 77.

48. Despite the staffing and the plaintiff's agreement to be compliant, on January 3, 2009, the plaintiff's blood sugars were completely erratic as evidenced by his finger stick blood tests. *Motion*, p. 13, ¶ 78 and Ex. A-3, ¶ 22; *Response*, p. 7, ¶ 78. Rittenhouse advised the plaintiff to eat and exercise the same every day in order to establish a pattern to his blood sugars. *Motion*, p. 13, ¶ 79 and Ex. A-3, ¶ 23; *Response*, p. 7, ¶ 79.

49. Rittenhouse continued to monitor the plaintiff s blood sugars and saw him on January 10, 2007; January 19, 2007; April 10, 2007; and April 23, 2007. The plaintiff's insulins were adjusted as needed on these dates. *Motion*, p. 13, ¶ 80 and Ex. A-3, ¶¶ 24- 28; *Response*, p. 7, ¶ 80.

50. At no time during her treatment of the plaintiff did Rittenhouse notice, nor was she aware of any weight loss, difficulty walking, talking, vision issues, bed wetting, or other failure

to thrive complications. The plaintiff also never mentioned any of these issues to her. *Motion*, p. 13, ¶ 81 and Ex. A-3, ¶ 29; *Response*, p. 7, ¶ 81.

51. At all relevant times, defendant Webster was employed as a Physician's Assistant at SCF. *Motion*, p. 13, ¶ 88 and Ex. A-4, ¶¶ 1-2; *Response*, p. 7, ¶ 88.

52. Webster treated the plaintiff for his Type I diabetes beginning in 2006. His treatment of the plaintiff included adjusting his insulins and prescribing other medications as needed, counseling him regarding how to better control his blood sugar, and ordering and interpreting his lab work. *Motion*, p. 13, ¶ 89 and Ex. A-4, ¶ 5; *Response*, p. 7, ¶ 89.

53. Webster first saw the plaintiff on April 5, 2006. During this appointment, the plaintiff requested more pain medication for his pelvic injury. *Motion*, p. 14, ¶ 92 and Ex. A-4, ¶ 9; *Response*, p. 7, ¶ 92. The plaintiff was already receiving Vicodin. Webster added Humabid, which can be a Vicodin "booster," allowing it to last longer and work better. *Motion*, p. 14, ¶ 93 and Ex. A-4, ¶ 9; *Response*, p. 7, ¶ 93. Webster entered the prescription for Humabid into DOC's computer system, which ensured that medical staff would be aware of the prescription. The plaintiff also still had an active prescription for Vicodin for his pain. *Motion*, p. 14, ¶ 94 and Ex. A-4, ¶ 10; *Response*, p. 7, ¶ 94.

54. Other than prescribing Humabid, Webster did not participate in establishing a plan of care or treating the plaintiff for his pelvic injury. *Motion*, p. 14, ¶ 96 and Ex. A-4, ¶ 12; *Response*, p. 7, ¶ 96.

55. On April 5, 2006, Webster also refilled other medications; requested an Ophthalmology consult; and ordered laboratory tests, including an Hgb A1c test. *Motion*, p. 14, ¶ 97 and Ex. A-4, ¶ 13; *Response*, p. 7, ¶ 97.

56. The plaintiff's Hgb A1c returned as 9.8, which is a poor result. Webster reviewed the plaintiff's canteen purchases which showed that the plaintiff was purchasing excessive high carbohydrate foods. *Motion*, p. 14, ¶ 98 and Ex. A-4, ¶ 14; *Response*, p. 7, ¶ 98.

57. Webster saw the plaintiff on August 1, 2006. *Motion*, p. 14, ¶ 99 and Ex. A-4, ¶ 15; *Response*, p. 5, ¶ 99. The plaintiff was experiencing morning low blood sugars. Webster adjusted his insulins to try to address this problem. *Motion*, p. 15, ¶ 100 and Ex. A-4, ¶ 16; *Response*, p. 7, ¶ 100. Webster prescribed Glucophage as a trial. Glucophage is a medication typically taken by Type II diabetics. However, it can be prescribed for Type I diabetics for use with insulin (which is then reduced), as it can reduce the risk of hypoglycemia. *Motion*, p. 15, ¶ 101 and Ex. A-4, ¶ 17; *Response*, p. 5, ¶ 101. The plaintiff's sliding scale insulin was adjusted to a higher baseline because he was experiencing hypoglycemic episodes by taking insulin and then skipping meals or exercising excessively. *Motion*, p. 15, ¶ 102 and Ex. A-4, ¶ 18; *Response*, p. 5, ¶ 102. Finally, Lantus insulin was reduced from 36 units to 34 units, until January 28, 2007, to help with the plaintiff's low blood sugar complaints. *Motion*, p. 15, ¶ 103 and Ex. A-4, ¶ 19; *Response*, p. 7, ¶ 103.

58. Webster does not recall any issues regarding the plaintiff's diabetic snacks. *Motion*, p. 15, ¶ 104 and Ex. A-4, ¶ 20; *Response*, p. 5, ¶ 104.

59. Webster saw the plaintiff on October 26, 2006. The plaintiff's insulins were adjusted after an in-depth discussion about his blood sugar patterns. The plaintiff agreed with the plan and also agreed to bring a blood sugar log to his next appointment. *Motion*, pp. 15-16, ¶ 105 and Ex. A-4, ¶ 21; *Response*, p. 7, ¶ 105. The plaintiff's Glucophage was stopped and his insulins were adjusted. *Motion*, p. 16, ¶ 106 and Ex. A-4, ¶ 22; *Response*, p. 7, ¶ 106.

60. Webster saw the plaintiff on November 16, 2006. Webster adjusted the plaintiff's insulin in order to avoid problems with hypoglycemia. *Motion*, p. 16, ¶ 107 and Ex. A-4, ¶¶ 23, 24; *Response*, p. 7, ¶ 107.

61. Webster saw the plaintiff on November 28, 2006. They discussed the plaintiff's meal skipping and how this would prohibit him from regulating his blood sugar. The plaintiff informed Webster that he wished to direct the amount and type of insulin he should receive. *Motion*, p. 16, ¶ 108 and Ex. A-4, ¶ 25; *Response*, p. 7, ¶ 108.

62. Webster attended the staff meeting on December 14, 2006, to discuss the plaintiff's noncompliance with his diet and skipping of meals and to discuss a plan of care to help him maintain better control of his blood sugar. *Motion*, p. 16, ¶ 109 and Ex. A-4, ¶ 26; *Response*, p. 7, ¶ 109.

63. Webster saw the plaintiff on October 9, 2007. They discussed his medical care and blood sugars. Webster ordered laboratory tests, including Hgb A1c. The plaintiff's Hgb A1c returned as 8.0, which was improved but not at goal. *Motion*, p. 16, ¶ 110 and Ex. A-4, ¶ 29; *Response*, p. 7, ¶ 110.

64. Webster saw the plaintiff on December 5, 2007. Webster adjusted his insulins and discussed the plaintiff's need for another ophthalmology exam, which are provided to diabetics on a regular basis. *Motion*, p. 16, ¶ 111 and Ex. A-4, ¶ 30; *Response*, p. 7, ¶ 111.

65. Webster saw the plaintiff on March 5, 2008. The plaintiff did not require any insulin adjustments at that time. However, his Hgb A1c increased to 8.4. By May 13, 2008, the plaintiff's Hgb A1c was down to 7.6, which was greatly improved. *Motion*, pp. 16-17, ¶ 112 and Ex. A-4, ¶ 31; *Response*, p. 7, ¶ 112.

66.   During the time in which Webster treated the plaintiff for his diabetes, he did not notice any weight loss, difficulty walking, talking, vision issues, bed wetting, or any other failure to thrive complications.  The plaintiff never mentioned any of these issues to Webster.  *Motion*, p. 17, ¶ 113 and Ex. A-4, ¶ 32; *Response*, p. 5, ¶ 113.

## IV.  ANALYSIS

This action is brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The defendants assert that they are entitled to qualified immunity on the plaintiff's claims.  *Motion*, pp. 31-32.  Qualified immunity shields government officials from liability for civil damages provided that their conduct when committed did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity not only shields a defendant from unwarranted liability, it also protects the defendant from the burdens of defending a suit. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The qualified immunity defense is available only to government officials sued in their individual capacities.  Buchwald v. University of New Mexico School of Medicine, 159 F.3d 487, 492 (10th Cir. 1998).

When a defendant asserts a qualified immunity defense on summary judgment, a heavy two-part burden shifts to the plaintiff.  Medina, 252 F.3d at 1128.  The plaintiff must establish that "the defendant's actions violated a constitutional or statutory right."  Scull v. New Mexico,

236 F.3d 588, 595 (10th Cir. 2000) (internal quotations and citations omitted). The plaintiff must also show "that the constitutional or statutory right the defendant allegedly violated was clearly established at the time of the conduct at issue."[3] Id. "A right is clearly established only if there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains. Only if the plaintiff establishes both elements of the test does the defendant bear the traditional burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Id. "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." Medina, 252 F.3d at 1128.

A prison official's deliberate indifference to an inmate's serious medical needs violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." Id. at 104-05. To establish a claim for deliberate indifference, a plaintiff must prove both an objective component and a subjective component.

The objective component is met if the inmate's medical need is sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.

---

[3]The order in which I may consider these factors is discretionary. Pearson v. Callahan, __ U.S. __, __, 129 S. Ct. 808, 818 (2009); Shroff v. Spellman, 604 F.3d 1179, 1188 (10th Cir. 2010).

1980)).    The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

## A. Claim One

In Claim One, the plaintiff alleges that the defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment based on the medical treatment he received after he fell off his bunk and injured his pelvis.[4] *Complaint*, pp. 7-8. Specifically, the plaintiff alleges that Dr. Fortunato refused to treat his fractured pelvis "due to money concerns," id. at p. 7; defendant Webster "failed to provide any treatment when he had the power, knowledge, and authority to help heal the Plaintiff's broken pelvis and decrease the severe pain"; and defendant Rittenhouse "was aware of the Plaintiff's fractured pelvis but failed to do anything to help it heal." Id. at pp. 7-8.

The undisputed facts establish that Dr. Fortunato initially saw the plaintiff on March 9, 2006, to evaluate his injuries from the fall. The plaintiff had an active prescription for Motrin, and he had also been prescribed Vicodin, a narcotic pain medication. After assessing the plaintiff's wounds, Dr. Fortunato requested a repeat x-ray of the pelvis to confirm the questionable ramus fracture. After reviewing the findings, Dr. Fortunato discussed the plaintiff's plan of care with an orthopedic specialist. He prescribed crutches, a wheelchair, pain medications, and TED stockings. It is further undisputed that on March 22, 2006, Dr. Fortunato renewed the plaintiff's Motrin for an additional six weeks and his Vicodin for an additional three

---

[4]Claim One also contains allegations regarding the defendants' treatment of the plaintiff's diabetes. I address the diabetes allegations in my analysis of Claim Two.

weeks, and that by April 18, 2006, the plaintiff was able to get out of his wheelchair and walk without assistance.

Under these facts, the plaintiff has not established that Dr. Fortunato was deliberately indifferent to his pelvic fracture. To the contrary, Dr. Fortunato actively treated the plaintiff's symptoms.

Although the plaintiff does not dispute the stated facts,[5] he attests that Dr. Fortunato told him he needed immediate surgery, then told him the next day that the surgery would not be ordered due to cost constraints. *Plaintiff's Response to Defendants* [sic] *Motion for Summary Judgment* [Doc. #52] (the "Response"), Ex. 1, ¶¶ 28-29; Ex. 3, ¶ 8. It is undisputed that a non-displaced pelvic fracture is not life or limb threatening; is managed conservatively; is treated by symptom management; and that surgery would be not be appropriate for this injury. To the extent the plaintiff disagrees with Dr. Fortunato's decision to treat his fractures conservatively,"a prisoner who merely disagrees with a . . . prescribed course of treatment does not state a constitutional violation." <u>Perkins v. Kansas Dept. of Corrections</u>, 165 F.3d 803, 811 (10th Cir. 1999).

The plaintiff further attests that Dr. Fortunato told him to elevate his legs to prevent the formation of blood clots, but he could not raise his legs because it was too painful. *Response*, Ex. 1, ¶ 32. This statement, without more, does not evince deliberate indifference on the part of Dr. Fortunato, especially in light of the undisputed fact that Dr. Fortunato prescribed TED stockings, which aid in circulation and are used to prevent blood vessel blockages.

---

[5]The plaintiff does not submit his own statement of undisputed material facts. However, he attaches several affidavits to his Response. Construing his brief liberally, I have examined the affidavits to discern any material facts.

Finally, the plaintiff attests that he informed Dr. Fortunato (on an unspecified date) that the pain medication was not working; that Dr. Fortunato did not increase the dosage of his medications; and, instead, Dr. Fortunato "ended the pain medication after a few days." Id. at Ex. 3, ¶ 9.  However, it is undisputed that Dr. Fortunato initially saw the plaintiff on March 9, 2006; the plaintiff had active prescriptions for Motrin and Vicodin at that time; on March 22, 2006, Dr. Fortunato renewed the plaintiff's Motrin for an additional six weeks and his Vicodin for an additional three weeks; and that by April 18, 2006, the plaintiff was able to get out of his wheelchair and walk without assistance.  The plaintiff's conclusory claim of inadequate pain medication is not sufficient to meet his burden to prove that Dr. Fortunato violated his Eighth Amendment rights.

As to defendant Webster, the plaintiff provides only a conclusory declaration that Webster "was aware of the severe pain I was in during the forced natural healing of my pelvis. However, he failed to provide me with any effective pain medication." *Response*, Ex. 3, ¶ 10. The record belies the plaintiff's conclusory allegation.  The following facts are undisputed: Webster first saw the plaintiff on April 5, 2006; during this appointment, the plaintiff requested more pain medication for his pelvic injury; the plaintiff was already receiving Motrin and Vicodin; Webster added Humabid, which can be a Vicodin "booster," allowing it to last longer and work better; and other than prescribing Humabid, Webster did not participate in establishing a plan of care or treating the plaintiff for his pelvic injury.  The plaintiff has failed to establish that Webster was deliberately indifferent to his medical needs.

The plaintiff does not provide any evidence to support his claim that defendant Rittenhouse "was aware of the Plaintiff's fractured pelvis but failed to do anything to help it

heal." Because the plaintiff has failed to meet his burden to show that the defendants were deliberately indifferent to his pelvic injury, the defendants are entitled to qualified immunity on Claim One. <u>Skull</u>, 236 F.3d at 595. The Motion should be granted insofar as it seeks summary judgment in favor of the defendants on Claim One.

## B.   Claim Two

In Claim Two, the plaintiff alleges deliberate indifference in violation of the Eighth Amendment based on the medical treatment he received for his diabetes. *Complaint*, pp. 8-9. The plaintiff alleges that Dr. Fortunato prescribed dangerous doses of insulin. <u>Id.</u> at p. 8. He further alleges that Webster continued the dangerous doses of insulin and prescribed Glucophage, which is a medication for Type II diabetes, <u>id.</u> at p. 8-9, and Rittenhouse "participated in administering the unsafe insulin treatments." <u>Id.</u> at p. 9.

In his affidavits, the plaintiff makes numerous allegations regarding the treatment of his diabetes. *Response*, Ex. 1, ¶¶ 34-50; Ex. 3, ¶¶ 11-15. I address only the allegations which are based in fact and are directed at the defendants' behavior. <u>See</u> <u>Handy v. Price</u>, 996 F.2d 1064, 1068 (10th Cir. 1993) (admonishing a *pro se* plaintiff that "[c]onclusory allegations . . . do not fulfill a nonmoving party's obligation when faced with affidavits and a motion for summary judgment").

The plaintiff attests that he told Dr. Fortunato, based on his prior experience with Lantus, that "17 units was too much." Nevertheless, Dr. Fortunato placed the plaintiff on 15 units of Lantus and slowly increased the dosage to 36 units, resulting in high blood sugar levels, weight loss, and vision problems. *Response*, Ex. 1, ¶¶ 34-36; Ex. 3, ¶ 11. However, it is undisputed that Dr. Fortunato adjusted the plaintiff's insulin based on the plaintiff's laboratory results. It is

further undisputed that the treatment for Type I diabetes varies from individual to individual, treatment also commonly varies with the individual, and it is common to adjust the amount of insulin given to a Type I diabetic in order to help stabilize their blood sugar.

The plaintiff further attests that Dr. Fortunato refused to give him the 10 units of Regular insulin he requested in the medicine line on July 13, 2006.  Id. at Ex. 1, ¶ 37.  The undisputed facts show that the plaintiff had a normal blood sugar at the time he requested the additional insulin and that Dr. Fortunato adjusted the plaintiff's insulin dosages on that day due to unsatisfactory blood sugar control.

The plaintiff has failed to meet his heavy burden to prove that Dr. Fortunato was deliberately indifferent in his treatment of the plaintiff's diabetes.  See Skull, 236 F.3d at 595.  Nor has the plaintiff shown that Webster and Rittenhouse were deliberately indifferent in continuing the "unsafe insulin treatments" prescribed by Dr. Fortunato.

Finally, the plaintiff attests that defendant Webster prescribed Glucophage on August 1, 2006.  Id. at ¶ 40.  It is undisputed that Webster prescribed Glucophage as a trial, and that although Glucophage is a medication typically taken by Type II diabetics, it can be prescribed for Type I diabetics for use with insulin (which is then reduced) because it can reduce the risk of hypoglycemia.  The plaintiff has failed to show that Webster was deliberately indifferent when he prescribed the Glucophage.

The United States Supreme Court has stated:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be  "repugnant to the conscience of mankind."  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.

> Medical malpractice does not become a constitutional violation
> merely because the victim is a prisoner. In order to state a
> cognizable claim, a prisoner must allege acts or omissions
> sufficiently harmful to evidence deliberate indifference to serious
> medical needs.

Estelle v. Gamble, 429 U.S. 97, 106 (1976).

The record shows that the plaintiff was seen numerous times by the defendants; he was given regular laboratory tests; his insulin dosages were frequently adjusted based on his test results; and he was on more than one occasion counseled about his disease and his diet. It is clear from the record that the defendants recognized the plaintiff's condition, and they treated it. The plaintiff disagrees that the defendants' treatment of his diabetes was proper, but disagreement with a course of treatment is not sufficient to prove deliberate indifference. Perkins, 165 F.3d at 811. At most, the plaintiff's allegations point to negligence, which is insufficient to support an Eighth Amendment claim.

Claim Two also alleges that the defendants knew the plaintiff was prone to seizures from his diabetic condition but "refused to intervene when the Plaintiff was housed on the third tier and on the top bunk." Id. The plaintiff attests that he told all three defendants "that with the blood sugar imbalances from the inadequate insulin treatments I would be suffering from siezures [sic] and possibly coma. I requested to be assigned to a bottom bunk, but was denied." Complaint, Ex. 3, ¶ 4. The plaintiff does not provide any evidence to show to whom he made his request for a bottom bunk; the date he requested the bottom bunk; who denied his request for a bottom bunk; or why such request was denied. Affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. Murray v. City of Sapulpa, 45

F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." Id.

The plaintiff has failed to meet his burden to prove that Dr. Fortunato, defendant Webster, and defendant Rittenhouse were deliberately indifferent to his diabetic condition. Therefore, the defendants are entitled to qualified immunity on Claim Two, Skull, 236 F.3d at 595, and the Motion should be granted insofar as it seeks summary judgment in favor of the defendants on Claim Two.

## V.  CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of the defendants on all of the plaintiff's claims against them.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated July 16, 2010.

BY THE COURT:

 s/ Boyd N. Boland                    
United States Magistrate Judge